T.C. Memo. 1996-162

UNITED STATES TAX COURT

MARK MASSINGILL AND INDRA MASSINGILL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19193-94.                    Filed March 28, 1996.

Mark and Indra Massingill, pro sese.

<u>David W. Sorenson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined a $11,006 deficiency
in petitioners' 1990 Federal income tax.  Respondent also
determined an addition to tax under section 6651(a)(1)[1] of $1,917
and an accuracy-related penalty under section 6662(a) of $1,390.

---

[1] All section references are to the Internal Revenue Code in
effect for the year at issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure, unless otherwise
indicated.

After concessions, the issues remaining for our consideration are: (1) Whether, in 1990, petitioners were engaged in an activity for profit pursuant to section 183(a); and (2) whether petitioners are liable for the addition to tax under 6651(a)(1) for 1990.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in Modesto, California, at the time the petition in this case was filed. Mark Massingill (petitioner) is an individual proprietor who, at various times, has engaged in engineering and metal mining and refining activities. These activities included, but were not limited to: The engineering and fabrication of industrial controls and laboratory instruments; recovering, refining, and selling mercury; testing and examining mineral properties; and miscellaneous researching and developing. The activity in question (metal mining and refining) does not involve the employment of individuals other than petitioner.

Petitioner developed his knowledge of the metal mining and refining field from an interest that began in his childhood. He possessed a rock collection upon which he performed chemical analyses of minerals and ore specimens. Petitioner fabricated his own chemicals such as nitric and hydrochloric acids in order

[2] Respondent has conceded that the sec. 6662(a) penalty is not applicable in this case.

to perform these experiments. In high school, petitioner studied chemistry. In college, petitioner majored in chemistry, mathematics, and physics. Petitioner also had performed some electrical engineering course work. Subsequently, petitioner terminated his college education in order to work full time as an electrical technician. Later, petitioner independently started a part-time business entailing the purchase of laboratory instruments at U.S. Government surplus sales. Then, he reconditioned and resold these items to laboratories.

In March 1977, petitioner began working full time on his own behalf. His desire at that time was to be "self-employed" in order to do technical research and development. Petitioner would engineer, fabricate and service controls for industrial fine equipment. These operations were petitioner's primary income during 1977 and 1978.

In 1979, petitioner began to experiment with recovering mercury from scrap batteries obtained from the U.S. General Services Administration and U.S. Department of Defense (DOD) surplus sales. Petitioner was spurred by the fact that in 1978 the price of mercury increased in the New York commodities market from slightly more than $1 a pound to close to $3 a pound. In past years, the price of mercury had been close to $1 dollar a pound. The surplus scrap batteries purchased ranged from watch batteries to 20-pound batteries. Petitioner developed a technique to extract and refine mercury from scrap batteries and

put the resulting solution in bottles. Petitioner sold the reclaimed mercury to individuals and entities in the gold mining industry for use in extracting the metal from ores. Sometime in 1980, petitioner began experiencing competition from an individual who was also recovering mercury from batteries. The competitor obtained batteries from the same sources as petitioner. By 1981, petitioner's primary source of income was the recovery and sale of purified mercury directly to users.

Sometime in 1982, the State of California imposed hazardous waste regulations that rendered scrap battery processing impractical for petitioner. In 1983, the California Department of Health Services Toxic Substances Control Program (DHS) began requiring the DOD to deliver mercury only to a California hazardous waste permitted facility. Petitioner was not able to obtain a hazardous waste facility permit which would have required extensive engineering documentation, and prohibitively high hazardous and environmental insurance. Hence, it was impractical for petitioner to proceed with mercury reclamation from scrap batteries because of the costs associated with a hazardous waste facility permit. Nevertheless, petitioner attempted to continue in the mercury business, with sources other than batteries, until he ultimately ceased selling mercury on May 31, 1988.

In 1983, in response to petitioner's cessation of the activity of extracting mercury from batteries, petitioner's wife

began outside employment. Petitioner's wife was employed full time as an assistant controller in a local television station from 1983 to 1990. Subsequently, she became the controller for that station. Before 1983, petitioner and his wife relied upon income from petitioner's mercury extraction activity as their sole source of income. After 1983, Mrs. Massingill's income became the source of petitioners' daily living expenses.

Furthermore, from 1984 to 1988, the reclamation of mercury was not petitioner's sole activity. Petitioner continued to perform industrial instrumentation and control, as well as a variety of research and development projects. Petitioner began doing test extractions of metals from ores and minerals, as well as the examination of properties, and performing amalgamation assays. However, during those years, the recovery of mercury from sources other than scrap batteries continued to be the primary activity for petitioner.

Petitioner advertised mercury for sale in a periodical called the "California Mining Journal". Sometime in 1982, petitioner prepared a prospectus and attended a trade show for the gold mining industry, involving both hobby and commercial interests. The prospectus explained petitioner's sale policies to prospective clients. It was distributed by "Massingill Metals" and includes petitioner's phone number, address and business hours. It states that any quantity of mercury may be ordered, although clients are cautioned that some large orders

may require additional time. The material also incorporates information on suggested uses for mercury in refining processes such as amalgamating gold or recovering gold from ores. The amount and the grade of mercury to be supplied determined the prices quoted by petitioner. The document states that base prices for mercury on the west coast were related to, but not necessarily governed by, the New York and German markets' spot price. In 1985, petitioner incorporated within his sales material procedures for dealing with a mercury spill, along with other general health and safety hazard information.

On January 16, 1985, in response to a complaint alleging the illegal storage, disposal and transportation of hazardous waste, DHS conducted an inspection of petitioner's shop and work premises. After several inspections, DHS alleged that petitioner violated environmental regulations. DHS alleged that paints, thinners, solvents, oils, mercury batteries, acids, and caustics were haphazardly stored in and around a large barn which comprised petitioner's work area. Large amounts of toxic ash generated by petitioner's reclamation of mercury were allegedly also found on site. DHS alleged that these quantities of "army surplus salvage" were a threat to public health and the environment. On December 30, 1987, DHS served petitioner with a remedial action order (RAO). The RAO provided that petitioner was to perform certain enumerated remedial actions, and failure to comply would result in DHS commencing proceedings to clean up

the site.  Petitioner would be liable for all direct and indirect costs associated with DHS cleaning up the site itself.

In 1988, petitioner and DHS engaged in an exchange of letters in which petitioner sought administrative relief which, ultimately, was denied.  DHS subsequently found petitioner's efforts at compliance to be unsatisfactory.  On June 28, 1988, DHS informed petitioner that he was not in compliance with the RAO, and that DHS would be instituting cleanup procedures of the property.  On December 26, 1989, DHS informed petitioner that a contractor would be commencing inventory activities of "hazardous substances" at the work site on January 15, 1990.  Actual inventory was performed sometime in the summer of 1990.  Petitioner was informed in a letter dated July 11, 1990, that the inventory was complete.  Petitioner was further informed that hazardous substances in allegedly deteriorated containers would be packaged and disposed of.  On August 15, 1990, DHS obtained a court order to enter the property and commence cleanup operations.  Sometime after that date, DHS's contractor seized the allegedly hazardous materials located in petitioner's work area.

In 1990, petitioner spent approximately 6 months addressing issues raised by DHS.  He intended to mitigate damage to his activities, preserve his assets, and ultimately resume work without interference from DHS.  Petitioner spent the first 2 months of the year filling out an inventory of the materials

stored in his work area. Petitioner corresponded with DHS in order to secure information and obtain administrative relief. Petitioner also consulted with attorneys in the matter. After the seizure of the materials by DHS, petitioner expended money to erect a fence on the property pursuant to DHS's specifications. This measure was intended to restrict public access to the allegedly hazardous materials still present at the property. Petitioner spent several hundred dollars in efforts to comply with DHS's requirements by over packing materials. Petitioner also spent approximately 1 month in 1990 fabricating equipment for customers. He worked on a prototype device that was a waste water cleaning machine. With a pressure washer, the device was intended to remove oils from contaminated water. Petitioner also had other projects for which he had orders. The remainder of the time was spent on general maintenance and shop housekeeping. For example, on August 17, 1990, petitioner placed zinc bearing residue on the ground for weed control. Other such maintenance activities included the cleaning, painting, and lubrication of machinery, disassembly of apparatus for recovery of components, and storage organization of parts and supplies.

Petitioner maintained a contemporaneous daily record of his activities during 1987 and 1988, until August 1988. At that time, for personal reasons, petitioner ceased recording the information in the logs. Petitioner partially resumed maintenance of the journal in 1989, and with more detail in 1990.

This journal is simply a bound collection of notebook lined paper. The days, month, and year are individually handwritten. The record itself indicates the month on top of the paper, and shows the days per line on the sheet of paper. The last two digits of the year are inscribed in the upper left-hand corner of the paper. Many of the entries consist of unexplained abbreviations. The handwriting is consistent, with no deviation in writing style, throughout all of the daily record. The record is not overly detailed, and it appears that petitioner generally was involved in one activity per working day. In 1987 through mid-1988, petitioner was busy every day. From mid-1988, large gaps in the days shown on the daily record appear. In 1990, the daily record shows that petitioner was involved in the first 2 months of the year with inventory preparation on behalf of DHS. Petitioner notes the seizure of materials in August 1990. The daily record also reflects that petitioner visited law libraries 5 out of the last 6 months of the calendar year 1990.

Petitioner also maintained records of sales of mercury to clients from 1983 to 1988. This sales record lists order numbers, the name of the clients, whether there was a "Small Order Labor Charge", how many pounds the order was, and the total charged with differing prices for in or outside of California. Petitioner had more customers inside the State of California than outside.

From 1978 to 1989, petitioner observed the proprietor of Valley Smelting, a successful business which was also involved in metal mining and refining activities. This person performed a variety of activities such as: Recovering and refining lead and mercury from scrap batteries, recovering metals from ores and ore samples, manufacturing irrigation valves, and, operating a mercury mine. Petitioner consulted with the proprietor in order to determine the best means of business operation.

Petitioner chose work that was "interesting" and not immediately profitable "whenever I had the cash to indulge * * * [I did] so." When petitioner needed income in his business, he would "do things that * * * [were] more mundane, less interesting, but immediately profitable, such as industrial controls, fabricating equipment." Petitioner has been able to find work whenever he needed it. "I've always been able to make sales * * * of that sort whenever I have needed to do so."

Petitioner, however, attempted to make the business profitable by trying to obtain a large margin between the sales price and the cost of goods sold. In time, petitioner was not able to obtain metallic mercury from scrap batteries, hence, he was unable to maintain a large margin between the sales price and the cost of goods.

The metal refining activities performed by petitioner took place on a 50-acre parcel that was mostly farm land. Petitioner's father farmed the land, and petitioner had a shop in

a barn on that property.  The land around the barn and a nearby house were also utilized by petitioner in his work.  Petitioner and his wife resided in a home, also owned by petitioner's parents, which was one-quarter of a mile away from the property in question.

Petitioners' Schedule C gross income, cost of goods sold (COGS), expenses, and net gain or loss from 1977 through 1990 are as follows:

| Year | Gross Income | COGS | Expenses | Gain/Loss |
|------|-------------|------|----------|-----------|
| 1977 | $52,324 | $29,673 | $16,313 | $6,338 |
| 1978 | 31,223 | 19,086 | 11,627 | [1]510 |
| 1979 | 50,132 | 36,255 | 13,340 | 537 |
| 1980 | 19,864 | 7,304 | 13,399 | (839) |
| 1981 | 22,132 | No record | No record | No record |
| 1982 | 24,924 | 5,208 | 19,566 | 150 |
| 1983 | 38,281 | 17,013 | 26,095 | [1](4,827) |
| 1984 | 19,912 | 9,955 | 19,531 | (9,574) |
| 1985 | 19,926 | 10,015 | 24,371 | (14,460) |
| 1986 | 15,731 | 8,618 | 25,265 | (18,152) |
| 1987 | 20,541 | 12,876 | 25,545 | (17,880) |
| 1988 | 10,375 | 6,190 | 21,015 | (16,830) |
| 1989 | 8,093 | 5,098 | 19,748 | (16,753) |
| 1990 | 3,867 | 2,502 | 19,253 | (17,888) |

[1]The parties stipulated to a $560 gain for 1978 and a $4,867 loss for 1983; however, the correct amounts appear to be a $510 gain for 1978 and a $4,827 loss for 1983.

The Schedule C cost of goods sold for 1990 in the amount of $2,502 consisted of 4 large batteries. These batteries were seized by the State of California.

### OPINION

Respondent has conceded that petitioner has substantiated the amounts in controversy. The primary issue to be decided is whether petitioner's metal mining and refining activities for 1990 constituted an activity engaged in for profit within the

meaning of section 183.  Petitioner contends that his metal mining and refining activity was entered into with a profit objective.  Respondent contends that petitioner's metal mining and refining activity was an activity "not engaged in for profit" within the meaning of section 183.  Sec. 183(c).

Section 183(a) provides that, if an activity engaged in by an individual is not engaged in for profit, no deduction attributable to such activity shall be allowed, except as provided in section 183(b).[3]  An "activity not engaged in for profit" means any activity other than one for which deductions are allowable under section 162 or under paragraphs (1) or (2) of section 212.  Sec. 183(c).  Section 162 allows a deduction for all the ordinary and necessary expenses paid or incurred in carrying on a business.  Section 212 allows a deduction for all the ordinary and necessary expenses paid or incurred for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.

Whether deductions are allowable under sections 162 or 212 depends on whether the taxpayer engaged in the activity with the

---

[3] In the case of an activity not engaged in for profit, sec. 183(b)(1) allows a deduction for expenses that are otherwise deductible without regard to whether the activity is engaged in for profit.  Sec. 183(b)(2) allows a deduction for expenses that would be deductible only if the activity were engaged in for profit, but only to the extent the total gross income derived from the activity exceeds the deductions allowed by sec. 183(b)(1).

objective of making a profit.  Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).  The taxpayer's expectation of profit need not be a reasonable one; however, the taxpayer must have a bona fide objective to make a profit.  Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Beck v. Commissioner, 85 T.C. 557, 569 (1985); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (2d Cir. 1979), affd. on another issue 615 F.2d 578 (2d Cir. 1980).

Whether a taxpayer has the requisite profit objective is a question of fact to be resolved on the basis of all of the facts and circumstances of the particular case.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner, supra at 720.  The taxpayer bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Greater weight is given to objective facts than a taxpayer's statement of intent.  Beck v. Commissioner, supra at 570; Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986).

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors relevant to the issue as to whether the taxpayer has the requisite profit objective.  These factors are:  (1) The manner in which the taxpayer carries on the

activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used by the taxpayer may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.  Not all of these factors are applicable in every case, and no one factor is controlling.  Taube v. Commissioner, 88 T.C. 464, 479-480 (1987); Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Allen v. Commissioner, 72 T.C. at 34.  No one factor nor a majority of the factors is determinative, and we do not reach our conclusion by merely counting the factors that support each party's position.  Taube v. Commissioner, supra at 480; Dunn v. Commissioner, supra at 720.

1.  The Manner in Which the Taxpayer Carries On the Activity

Petitioner contends that he conducted his activity in a businesslike manner.  However, petitioner did not maintain adequate and accurate books of accounts and records of income and expenses of the metal mining and refining activities.  Petitioner testified that he maintained timely contemporaneous records of his activities.  However, the extensive and businesslike records of sales of mercury which only go up to 1988 is not duplicated

for any other aspect of the metal mining and refining activity in 1990. Petitioner also submitted a daily log of his activities which incorporates 1990. However, much of what is written down in that journal contains unexplained abbreviations. There are blank spaces for a large number of days each month for 1990. Moreover, petitioner's compendium is not an adequate substitute for books or records of income and expenses. For example, unlike the records of sales of mercury, this does not list customers, the kind of work performed, and the amounts charged, if any. Thus, we cannot say that petitioner maintained adequate and accurate books of accounts.

Petitioner's marketing activities were, at best, minimal. He advertised in the "California Mining Journal". Petitioner distributed a prospectus on his sales policies to possible clients. He also attended trade shows where he could meet prospective customers. The records of sales of mercury show that most of petitioner's clients came from within California. There were very few clients who were from out of State. Other than the above factors, petitioner presented no evidence that he actively sought business. Petitioner has not specifically shown any other marketing activities in 1990.

In addition, petitioner had no business plan. At trial, petitioner testified that he did not expect to earn a profit immediately during 1986, before the dispute with DHS. He expected to do so in 1987 but did not do so. The record reflects

that petitioner suffered 7 years of losses up to and including the taxable year 1990. Petitioner had no business plan to address the accumulating and expected losses.

While it is likely that petitioner entered into the metal mining and refining activity with a profit objective, the extended record of losses without abatement devalued the activity into one that provided an offset to petitioners' other income.

2. The Expertise of the Taxpayer and His Advisers

Petitioner developed, since childhood, the technical knowledge, skill, and interest in the metal mining and refining field. Petitioner also observed the proprietor of Valley Smelting, a similar concern allegedly also involved in a similar activity. Finally, by 1980, petitioner had a competitor who was also recovering mercury from scrap batteries. Petitioner did not demonstrate how he utilized the information gathered to address any business decisions confronting his activity such as the rates of continuing losses.

Although petitioner's wife was a controller possessing financial skills to develop and operate a business plan, the record does not demonstrate that her skills were utilized.

3. The Time and Effort Expended by the Taxpayer in Carrying On the Activity

Petitioner spent a minimal amount of time carrying out the activity in 1990. He spent approximately 1 month on the production of income in 1990. He contends, however, that the

State of California prevented him from earning money in his pursuit. We recognize that the fact that the taxpayer devoted less than full time to the activity does not necessarily indicate the lack of a profit objective, where the taxpayer employs competent and qualified persons to carry on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. However, this is not the situation here. This activity was maintained alone by petitioner.

Although petitioner chose to engage in a personal pursuit for relief from the environmental regulations, he did nothing to remedy his lack of income or to reduce his expenses. By his testimony, petitioner spent several months in 1990 addressing compliance issues with DHS. We find that petitioner was genuinely motivated by the desire to preserve his assets. On the other hand, we think that the minimal amount of time petitioner spent in this activity does not support his contention that he was engaged in this activity with a profit objective in 1990.

4. <u>The Expectation That Assets Used in the Activity May Appreciate in Value</u>

Petitioner did not present any evidence that any of the assets used in his metal mining and refining activity would appreciate in value.

5. <u>The Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities</u>

Petitioner did not present any evidence that he had been involved or demonstrated any success in any similar or dissimilar type of activity.

6.   The Taxpayer's History of Income or Losses With Respect to the Activity

Although no one factor is determinative of the taxpayer's objective to make a profit, a record of substantial losses, and the unlikelihood of achieving a profitable operation is highly probative of the taxpayer's true objective.  Golanty v. Commissioner, 72 T.C. at 411; sec. 1.183-2(b)(6), Income Tax Regs.

Petitioner's main argument in this case is that the activities of a State agency prevented him from operating a profitable activity during 1990.  Petitioner's difficulties with DHS resulted in prolonged delay, and, ultimately, in the seizure of significant portions of petitioner's inventory that was allegedly hazardous waste.

Petitioner knew or should have known he was engaged in a business that involved dangerous or hazardous chemicals. Performing metal mining and refining operations required adherence, at least to a degree, to minimal environmental regulations, which represented a cost of doing business in this particular field.  Petitioner did not comply, and when confronted with the environmental regulations, he chose to engage in lengthy litigation.  The dispute with DHS was not an unforeseen

circumstance that prevented petitioner from obtaining a profit in this activity.  Sec. 1.183-2(b)(6), Income Tax Regs.

The fact remains that petitioner had zero net income from his metal mining and refining activity in 1990, and this was a 7-year trend.  The cost of goods sold has diverged over the years but, in general, there is a decrease.  Finally, petitioner's gross income steadily declined leading up to 1990 while expenses remained relatively stable.  Furthermore, we notice that petitioner's expenses were not demonstrably affected by the cessation of the activity of selling mercury in 1988.  Hence, we believe that the shortfall was not due to the dispute with DHS, but, rather, that the activity itself could not reasonably be expected to result in a profit, and because petitioner took no measures to reduce his expenditures for unprofitable activities.

7.  <u>The Amount of Occasional Profits Earned, if Any</u>

The record demonstrates profitability only in 4 of the earliest of 14 years.  The 7 years up to and including 1990 demonstrate consistent losses similar in magnitude.

8.  <u>The Financial Status of the Taxpayer</u>

The metal mining and refining activity was profitable only in the first few years.  All subsequent years show losses of a considerable scope.  Also, there existed no financial pressure or incentive on petitioner to pursue work that was consistently profitable.  In fact, the support of petitioner's parents and wife allowed petitioner to sustain the losses incurred in the

activity year after year.  Petitioner's parents provided the use of a residence and a barn where the activity was conducted. Petitioner's wife's wages earned met living expenses, which allowed petitioner to maintain the activity in question.

9.  The Elements of Personal Pleasure or Recreation Involved in the Activity

The record clearly demonstrates that petitioner has been strongly interested in the field of metal mining and refining since he was a youth.  It was this interest that motivated petitioner to get involved in the metal mining and refining activity.  Petitioner testified that the aspects of that particular activity were "interesting" to him.  He noted that this activity was not immediately profitable.  We believe that engaging in this activity provided significant pleasure to petitioner.

Hard work alone is not enough to establish a profit-seeking objective.  Feldman v. Commissioner, T.C. Memo. 1986-287.  While the metal mining and refining activity is hard physical work and may not seem pleasurable to some, petitioner enjoyed this activity and lifestyle.  In addition, petitioner had a propensity to pursue these activities, which he found pleasurable such as research.  He would pursue less desirable income-producing activities only to the extent that it would serve to finance his enjoyable non-income-producing pursuits.

After considering the entire record, we hold that petitioner did not engage in the activity of metal mining and refining during 1990 with the bona fide objective of making a profit. Other than his self-serving testimony, we find that petitioner did not present any evidence that supported his position that he had an actual and honest objective of making a profit from his metal mining and refining activity. Petitioner, based on his losses, should have been aware that the activity was either incapable of generating a profit or that his performance and assumptions were seriously flawed. However, the record does not show that petitioner had a business plan to stem or assuage the losses. Hence, we find that petitioner has failed to carry his burden of proving that he engaged in that activity with a profit objective.

We hold that petitioner was not engaged in an activity for profit under section 183. Accordingly, we sustain respondent on this issue.

## Failure to File

Finally, we decide whether petitioner is liable for the addition to tax under section 6651(a)(1) for failure to file a timely return. Section 6651(a)(1) provides for an addition to tax of 5 percent of the amount of income tax required to be shown on the return if such failure to file is for not more than 1 month, with an additional 5 percent for each month such failure continues, not to exceed 25 percent. The addition to tax under

section 6651(a)(1) applies unless the taxpayer establishes that the failure to file did not result from "willful neglect" and that the failure to file was "due to reasonable cause."  "Willful neglect" has been construed to mean a conscious, intentional failure, or reckless indifference.  <u>United States v. Boyle</u>, 469 U.S. 241, 245-246 (1985).  "Reasonable cause" requires a taxpayer to demonstrate that he or she exercised ordinary business care or prudence.

Petitioner's 1990 tax return was signed by the petitioners on October 22, 1991, and received by respondent on October 24, 1991.  Petitioner has failed to present any evidence of reasonable cause for filing his return late.  Therefore, petitioner is liable for the addition to tax under section 6651(a)(1).

To reflect the foregoing,

Decision will be entered

under Rule 155.